IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
WESTERN DIVISION

U.S. TECHNOLOGY CORPORATION, et al.          PLAINTIFFS

VS.                        CIVIL ACTION NO. 5:15-cv-66(DCB)(MTP)

MISSISSIPPI DEPARTMENT OF
ENVIRONMENTAL QUALITY, et al.                DEFENDANTS

<u>MEMORANDUM OPINION AND ORDER</u>

This cause is before the Court on the Motion to Dismiss **(docket entry 34)** brought by defendant Richard Harrell ("Harrell") in his individual capacity; on the Motion to Dismiss **(docket entry 36)** brought by defendant Steven Bailey ("Bailey") in his individual capacity; and on the Motion for Preliminary Injunction **(docket entry 53)** brought by plaintiffs U.S. Technology Corporation and Raymond F. Williams.  Having carefully considered the motions and responses, the memoranda of the parties and the applicable law, and being fully advised in the premises, the Court finds as follows:

Plaintiff U.S. Technology Corporation ("UST") and an entity known as Hydromex entered into a supply and recycle agreement on August 11, 2000.  The Hydromex Agreement obligated Hydromex to recycle a material called "spent blast material" ("SBM") sent by UST to the Hydromex operation in Yazoo City, Mississippi.  According to the plaintiffs' Amended Complaint, defendant Steven Bailey, an employee of defendant Mississippi Department of Environmental Quality ("MDEQ"), visited the Yazoo site from 2000-

2002.  Shortly after Bailey's visits to the site began, MDEQ issued an order against Hydromex, and Hydromex was shut down in November of 2002.  Thereafter, MDEQ and UST entered into an Agreed Order, and a series of Amendments to that Order, concerning the SBM at the Yazoo property.  In 2008, UST also filed a lawsuit against Pat Ramsay and Delta Logging Company, Inc. ("Delta Logging").[1]  In the 2008 lawsuit, UST sought cost recovery and contribution from Ramsay and Delta Logging (the landowner of the subject property) for remediation and recycling costs related to the remaining waste at the Yazoo property, under the Federal Comprehensive Environmental Response Compensation and Liability Act ("CERCLA").  The 2008 lawsuit was ultimately resolved through an agreement between UST and Ramsay, pursuant to which UST would continue operations as outlined in a 2011 Agreed Order between UST and MDEQ.

Two years later, in 2013, the plaintiffs maintain that they "petition[ed] the Court for relief" in the case between UST and Ramsay due to "intervening causes interfering with the completion of the settlement agreement between ... UST and Ramsay." Amended Complaint, ¶ 72.  Thereafter, the plaintiffs contend that MDEQ sent UST a cease and desist letter concerning the SBM after test results "reported high cadmium results." Id., ¶¶ 88, 90.  The plaintiffs contend that MDEQ's testing of the SBM was incorrect, that the plaintiffs' testing was accurate, and that the SBM is non-toxic.

---

[1] UST v. Ramsay, et al., Civil Action No. 5:08-cv-218(DCB).

Id., ¶¶ 98-99.  On July 14, 2015, the plaintiffs filed their original Complaint in the instant federal action, and subsequently filed an Amended Complaint on December 3, 2015.

There are two federal causes of action asserted against the individual defendants Harrell and Bailey in the Amended Complaint: Deprivation of Due Process Rights under 42 U.S.C. § 1983 (Count 8), and Violation of the Dormant Commerce Clause (Count 9).  The plaintiffs' claims and the individual defendants' qualified immunity defenses must be viewed in conjunction with the series of agreed orders entered into between the plaintiffs and MDEQ.  After the Hydromex operation was shut down in 2002, UST and MDEQ entered an Agreed Order and a series of Amendments, which are incorporated in and attached to the plaintiffs' Amended Complaint.

2003 Agreed Order: The first Agreed Order was entered into between UST and MDEQ in July of 2003.  This original Order provides that UST "shipped to Hydromex much of the spent blast material ["SBM"] that has been received at and handled by Hydromex." Agreed Order, p. 1.  The Agreed Order also states that the material "received by Hydromex was to be either nonhazardous or was to be handled and recycled in such a manner as to qualify the material for the 'recycling exclusion' from the definition of solid waste contained in 40 C.F.R. § 261.2(e)." Id.  The Agreed Order further states that "much of the material received by Hydromex was handled in an improper manner." Id.

In addition, and pursuant to Commission Order No. 4510-02 issued against Hydromex, the 2003 Agreed Order explicitly set forth MDEQ's position on the material at issue in the instant litigation: "the Commission considers all of this material in its current condition or status to be solid or hazardous waste subject to regulation by Subtitles D and C of the Resource Conservation and Recovery Act ..., Miss. Code Ann. § 17-17-1 et seq., and the Mississippi Hazardous Waste Management Regulations (Regulation HW-1)." Agreed Order, p. 2. Through the original Agreed Order, UST sought "permission from the Commission to conduct operations at the Hydromex facility to recycle and remove the containerized material and the inadequately or improperly recycled material located at the Hydromex facility." Id. UST submitted to MDEQ "a comprehensive plan describing how [UST] proposes to handle the ... material ... at the Hydromex site in a manner that will render the material nonhazardous ...." Id., p. 3. The Agreed Order set forth that any "deviation from this plan must be approved in advance by the Commission." Id., pp. 3-4. The Agreed Order also made clear that "[n]othing ... shall limit the rights of MDEQ or the Commission in the event [UST] fails to comply with the Agreed Order," and that "[n]othing contained in this Agreed Order shall limit the rights of the Commission to take enforcement or other actions against [UST] ... for past, present, or future violations of environmental laws, rules, and regulations or for the creation or exacerbation of any

pollution or contamination at the Hydromex facility." Id., p. 7.

2011 Agreed Order, First Amendment: In February 2011, UST
sought to amend the original agreed order. Specifically, UST sought
"permission from the Commission to remediate the former Hydromex,
Inc. site. The ultimate objective of th[e] Agreed Order Amendment
is to remediate the site to clear closure." First Amendment (Doc.
28-4). Under this Amendment to the Agreed Order, UST was to "submit
a Site Remediation Plan to MDEQ for approval" and upon MDEQ's
request, UST was to "perform TCLP analyses on the blocks and report
its results to MDEQ." Id. Similarly, under the agreed amendment,
"[a]ll materials deemed by MDEQ to be non-recyclable" were to be
"evaluated ... for appropriate disposition as determined by MDEQ"
and any sampling results were to be provided to MDEQ, with MDEQ
retaining the right to "take split samples." The 2011 amendment
also provided as follows:

> [UST] shall have two (2) calendar years … to complete the
> processes of material recovery, onsite reconstitution,
> shipment of the recyclable materials to the designated
> manufacturing facility, disposal of the non-recyclable
> materials, over-excavation of the soil, and disposal of
> the over-excavated soil.
>
> . . .
>
> Any deviation from this Agreed Order Amendment, the Site
> Remediation Plan, or the Post-Closure Plan must be
> approved in advance in writing by MDEQ on behalf of the
> Commission.

Id.

2013 Second Agreed Order Amendment:  In June 2013, ten years

after the original agreed order, UST sought to amend again, and MDEQ agreed to provide "additional time to [UST] to remediate the [Hydromex] site." Second Amendment, p. 2. By the terms of the second agreed amendment, UST was provided until December 31, 2013 to "remediate the site" and UST was allowed "to utilize the processed SBM at the site as intermediate road base as approved by the Mississippi Department of Transportation." Id., pp. 2-3. This agreed order also outlined a process for sampling test results and stated that MDEQ "may take split samples." Id., pp. 4-5. Further, the second agreed order mandated that "[a]ny deviation from this Second Amendment to Agreed Order must be approved in advance in writing by MDEQ on behalf of the Commission." Id., p. 9.

In their Amended Complaint, the plaintiffs maintain that, on or about October of 2013, "MDOT informed Plaintiff Williams of UST that the project [discussed in the second agreed amendment] did not receive its funding and as such the project would not be going forward as planned." Amended Complaint, ¶ 56. Plaintiff Williams allegedly contacted Defendant Bailey from MDEQ and requested that UST be allowed to "move the remaining SBM down the street to store it until the MDOT funding was received or other arrangements could be made." Id., ¶ 58. According to the complaint, "Defendant Harrell directed Defendant Bailey to inform Plaintiff Williams that he could not store the SBM a mile down the road" and that the SBM needed to be removed by December 31, 2013 per the express language

of the agreed order.  Id., ¶ 60.

Nevertheless, the plaintiffs then "entered into a contract with a recycling facility known as and referred to as MGM in Missouri" and "took measures to have the SBM moved to MGM," without receiving written approval from MDEQ as required by the 2013 agreed order amendment.  Id., ¶¶ 66-67.  The Amended Complaint alleges that "Plaintiff Williams had a conversation with Defendant Bailey and Attorney Roy Furrh from MDEQ about the shipments ...." Id., ¶ 70. The plaintiffs characterize MDEQ's direction for the plaintiffs to "cease all shipments to Missouri" as "arbitrary," despite the second agreed order amendment not being complied with by UST, and despite UST admitting to violating the second agreed order amendment in the third agreed order amendment.

2014 Third Agreed Order Amendment:  In April 2014, MDEQ and UST entered into a third amendment to the original agreed order.   In pertinent part, the agreement states:

> In October and November, 2013, [UST] shipped via truck approximately 9,075,722 pounds of wastes including Spent Blast Material ("SBM") from the Hydromex site ... to Missouri Green Materials ("MGM") without obtaining the required approval from MDEQ. This action by [UST] was a violation of the Second Amendment to Agreed Order Number 4614-03 previously issued on June 13, 2013 .... Approximately 7,000,000 pounds of the wastes remain on location at the Hydromex site.
>
> ...
>
> In violation of ... the Second Amendment to Agreed Order No. 4613 03, [UST] has failed to use the SBM at the MDOT site(s) and did not properly dispose of the remaining material by December 31, 2013; and further, [UST] did not

seek or gain approval in advance from MDEQ prior to
shipping approximately 9,075,722 pounds of wastes
including SBM to Missouri.

Third Amendment, pp. 1-2.

Despite UST's labeling MDEQ actions as "arbitrary," UST entered

into the third agreed order, agreeing to the above violations.  UST

also "agree[d] to settle the ... matter ... [i]n lieu of a formal

enforcement hearing." Id., ¶ 3.  In addition, UST agreed "to treat

and dispose of the remaining approximately 7 million pounds of

wastes including SBM and contaminated soil at the Hydromex site ....

In addition to the Treatment and Disposal plan requirements, [UST]

must treat the wastes at the site to meet federal land disposal

restrictions ("LDR") standards before transportation and disposal

of the treated material." Id., ¶¶ 3-4.

Much of the plaintiffs' complaint in this case centers on a

dispute over the testing of the SBM and whether it should be

classified as "waste," despite the fact that the SBM is clearly

classified as "waste" in the 2014 third agreed order amendment, and

in the original agreed order of 2003.  Like the previous agreed

amendments, the third agreed order amendment contains the following

provisions:

Any deviation from this Third Amendment to Agreed Order
must be approved in advance in writing by MDEQ on behalf
of the Commission.

. . .

The execution of this Third Amendment to Agreed Order by
[UST] constitutes [UST's] commitment to remediate the

8

site to clean closure.

. . .

[UST] consents to the entry of this Third Amendment to
Agreed Order by resolving the claims of the Commission
addressed herein. At the same time, the parties agree
that the Commission continues to allege that the matters
addressed herein are violations as expressed herein.

Id., pp. 8-9.

In addition, Section 9 of the third amendment specifically
indicates that MDEQ and the commission are not limited in taking
enforcement or other actions for violations not addressed or for
future violations. Id. at 20, ¶ 9. Shortly after the entry of that
order, MDEQ "decided to test the treated material," as provided in
the order, and "the results reported high cadmium results." Amended
Complaint, ¶ 88. According to the Amended Complaint, "the high
results as reported by the internal MDEQ lab caused MDEQ to send a
cease and desist letter on July 8, 2014 to Plaintiff UST's counsel."
Id., ¶ 90. The plaintiffs maintain that "MDEQ chief of staff, Chris
Wells, indicated in an email in November of 2014 that Plaintiff UST
could proceed under the Order if payments were made to MDEQ of
$5,000.00 a week. Such a stance by Mr. Wells is arbitrary,
capricious and abusive to Plaintiffs." Id., ¶¶ 106-107.

The defendants move for dismissal of the Amended Complaint.
To survive a motion to dismiss under Federal Rule of Civil Procedure
12(b)(6), a "complaint must allege 'sufficient factual matter,
accepted as true, to state a claim that is plausible on its face.'"

9

<u>Hershey v. Energy Transfer Partners, L.P.</u>, 610 F.3d 239, 245 (5th
Cir. 2010)(quoting <u>Ashcroft v. Iqbal</u>, 556 U.S. 662, 129 S. Ct. 1937,
1949 (2009)).  "'A claim has facial plausibility when the pleaded
factual content allows the court to draw the reasonable inference
that the defendant is liable for the misconduct alleged.'" <u>Hershey</u>,
610 F.3d at 245 (quoting <u>Iqbal</u>, 556 U.S. 662, 129 S.Ct. at 1949).
Although a court must take the factual allegations in the complaint
as true and construe them in the light most favorable to the
plaintiff, this "tenet" is "inapplicable to legal conclusions."
<u>Iqbal</u>, 556 U.S. at 678.  In other words, "conclusory allegations or
legal conclusions masquerading as factual conclusions will not
suffice to prevent a motion to dismiss." <u>Fernandez-Montes v. Allied
Pilots Ass'n</u>, 987 F.2d 278, 284 (5th Cir. 1993); <u>Patton v. Bryant</u>,
2014 WL 36618, *1 (S.D. Miss. Jan. 6, 2014), <u>reconsideration denied</u>,
2014 WL 457921 (S.D. Miss. Feb. 4, 2014), <u>aff'd</u>, 584 F. App'x 242
(5th Cir. 2014).

I. 42 U.S.C. Section 1983 and Qualified Immunity

The defendants claim qualified immunity in reference to 42
U.S.C. § 1983.  The doctrine of qualified immunity shields a
governmental official from civil liability for damages based upon
the performance of discretionary functions if the official's acts
did not violate clearly established constitutional or statutory law
of which a reasonable person would have known.  <u>Easter v. Powell</u>,
467 F.3d 459, 462 (5th Cir. 2006).  Qualified immunity applies when

a government official reasonably could have believed that his actions were legal. Morgan v. Swanson, 659 F.3d 359, 370 (5th Cir. 2011)(en banc). "This immunity protects all but the plainly incompetent or those who knowingly violate the law ...." Id. at 371. Therefore, a court should not deny immunity unless "existing precedent [has] placed the statutory or constitutional question beyond debate." Id. (quoting Ashcroft v. al-Kidd, 131 S. Ct. 2074, 2083, 179 L. Ed. 2d 1149 (2011)).

To determine whether a defendant is entitled to qualified immunity, the court engages in a non-sequential, two-pronged analysis, inquiring "(1) whether the plaintiff has alleged a violation of a constitutional right and, if so, (2) whether the defendant's behavior was objectively reasonable under clearly established law at the time the conduct occurred." Parks v. City of Oxford, Miss., 2013 WL 123703, *3 (N.D. Miss. Jan. 9, 2013)(citing Easter, 467 F.3d at 462). If the plaintiff fails to state a constitutional claim or if the defendant's conduct was objectively reasonable under clearly established law, then the governmental official is entitled to qualified immunity. Id.

Once a defendant has invoked qualified immunity, the plaintiff has the burden of demonstrating that the defendant is not entitled to such immunity. Freeman v. Gore, 483 F.3d 404, 410 (5th Cir. 2007). To sustain the burden under § 1983, a plaintiff "must claim that the defendants committed a constitutional violation under

11

current law" and "that the defendants' actions were objectively unreasonable in light of the law that was clearly established at the time of the actions complained of." Atteberry v. Nocona Gen. Hosp., 430 F.3d 245, 252-53 (5th Cir. 2005). Even after Iqbal, the Fifth Circuit has explained that, when a defendant asserts the defense of qualified immunity, district courts "are guided both by the ordinary pleading standard and a heightened one." Floyd v. City of Kenner, 351 F.App'x 890, 893 (5th Cir. 2009). "Heightened pleading requires allegations of fact focusing specifically on the conduct of the individual who caused plaintiff's injury." Reyes v. Sazan, 168 F.3d 158, 161 (5th Cir. 1999). A plaintiff, under this standard, "cannot be allowed to rest on general characterizations" in its complaint. Schultea v. Wood, 47 F.3d 1427, 1432 (5th Cir. 1995)(en banc). Instead, the complaint "must speak to the factual particulars of the alleged actions ...." Id.

The plaintiffs' claims, pursuant to 42 U.S.C. § 1983, are also subject to section 1983's statute of limitations. Many of the allegations asserted in the amended complaint fall outside of the statute of limitations. For instance, much of the complaint refers to alleged actions taken by MDEQ and/or the individual defendants in 2002 and early 2011. Amended Complaint, ¶¶ 25-46. Because Congress has not specified a limitations period for Section 1983 suits, in such cases "federal courts borrow the forum state's general personal injury limitations period." Piotrowski v. City of

12

Houston, 51 F.3d 512, 514 n.5 (5th Cir. 1995).   The relevant limitations period in Mississippi is three (3) years from the day the cause of action accrues.  Miss. Code Ann. § 15-1-49 (2003); see also James v. Sadler, 909 F.2d 834, 836 (5th Cir. 1990)(in § 1983 suit, finding "the three year residual period provided by Section 15-1-49, Miss. Code Ann. applies"); Cuvillier v. Taylor, 503 F.3d 397, 401-02 (5th Cir. 2007).  The plaintiffs' original Complaint was filed on July 14, 2015, and their Amended Complaint was filed on December 3, 2015.   Therefore, to survive a motion to dismiss on statute of limitations grounds, the plaintiffs' claims must have originated less than three years before the complaints were filed.

Several of the allegations in the Amended Complaint are brought solely against MDEQ, "the defendants" collectively and/or other named MDEQ officials.  Such vague and imprecise allegations do not comport with the doctrine of qualified immunity and the dictates of Section 1983.  Liability under Section 1983 may not be conferred to an individual defendant by general allegations against MDEQ or other individuals employed by MDEQ, because proof of an individual defendant's personal involvement in the alleged wrong is a prerequisite to liability on a claim for damages under 42 U.S.C. § 1983.  Tate v. Gusman, 459 F. Supp.2d 519, 523 (E.D. La. 2006).  A state actor may be individually liable under § 1983 only if he or she "was personally involved in the acts causing the deprivation of his constitutional rights ...."  Douthit v. Jones, 641 F.2d 345 (5th

13

Cir. 1981); see also Watson v. Interstate Fire & Casualty Co., 611 F.2d 120 (5th Cir. 1980).   Thus, the individual defendants are entitled to immunity under § 1983 for any asserted actions in which they were not personally involved.

## II. The Dormant Commerce Clause Claim

The Commerce Clause provides that Congress has the power to regulate interstate commerce.   U.S. CONST. ART. I, § 8, c1. 1,3. If, however, Congress has chosen not to regulate in a certain area, then the states or localities may regulate in that area, subject to the so-called "Dormant Commerce Clause." United Haulers Ass'n, Inc. v. Oneida-Herkimer Solid Waste Mgmt., 127 S.Ct. 1786, 1792-93 (2007).   Dormant Commerce Clause analysis involves a two-step inquiry: the first question is "whether a challenged law discriminates against interstate commerce." Department of Revenue of Ky. v. Davis, 553 U.S. 328, 338 (2008); see also United Haulers Ass'n., Inc. v. Oneida-Herkimer Solid Waste Mgmt. Auth., 550 U.S. 330, 338 (2007)("to determine whether a law violates this so-called 'dormant' aspect of the Commerce Clause, we first ask whether it discriminates on its face against interstate commerce").   The second step of the inquiry examines any potential burden placed on interstate commerce: "Absent discrimination for [a] forbidden purpose ... the law 'will be upheld unless the burden imposed on [interstate] commerce is clearly excessive in relation to the putative local benefits.'" Davis, 553 U.S. at 338-39.   The Dormant

Commerce Clause generally "prohibits economic protectionism – that is, regulatory measures designed to benefit in-state economic interests by burdening out-of-state competitors." New Energy Co. v. Limbach, 486 U.S. 269, 273 (1988).

In this case, the plaintiffs' allegations do not raise a Dormant Commerce Clause concern, nor do they allege that defendants Harrell and/or Bailey acted objectively unreasonable under any "clearly established" Dormant Commerce Clause law.  In fact, they do not point to a single state or local law that supposedly runs afoul of the dormant Commerce Clause.  The plaintiffs contend only that "Defendants' statements to the Missouri EPA that the SBM was hazardous, and ordering Plaintiffs to cease all SBM shipments to MGM, the Missouri facility, had and have no basis in law."  Amended Complaint, ¶ 208.  Although the plaintiffs contend that the SBM should not be classified as "hazardous waste" and that the plaintiffs should be able to transport the SBM wherever they please, the Dormant Commerce Clause does not afford such a right.  The Commerce Clause does not bestow on businesses a right to be free from allegedly excessive regulation, environmental or otherwise. Nor does the Clause protect any particular business or individual engaged in interstate commerce.  In rejecting such claims of undue burden, the Fifth Circuit has emphasized that the Clause "protects the interstate market, not particular interstate firms." Allstate Insur. Co. v. Abbott, 495 F.3d 151, 164 (5th Cir. 2007).  "[T]he

fact that a law may have 'devastating economic consequences' on a particular interstate firm is not sufficient to rise to a Commerce Clause burden." <u>Pharm. Research & Mfrs. of Am. v. Concannon</u>, 249 F.3d 66, 84 (1st Cir. 2001).

Moreover, the plaintiffs do not plead any "discrimination" on interstate commerce, and do not plead facts showing the absence of even-handedness in the application of any state or local law. Discrimination in the instant context is defined as the "differential treatment of in-state and out-of-state economic interests that benefits the former and burdens the latter." <u>Oregon Waste Sys. Inc. v. Dep't of Envtl. Quality</u>, 511 U.S. 93, 99 (1994). The classic example of discriminatory treatment is a state law that imposes substantially higher fees on out-of-state operators than similarly situated in-state operators. <u>See</u>, <u>e.g.</u>, <u>Ford Motor Co. v. Texas Dep't of Transp.</u>, 264 F.3d 493, 500 (5th Cir. 2001). That a regulatory burden "falls on some interstate companies does not, by itself establish a claim of discrimination against interstate commerce." <u>Exxon Corp. v. Maryland</u>, 437 U.S. 117, 126 (1978); <u>Ford Motor Co.</u>, 264 F.3d at 501.

The plaintiffs' Amended Complaint contains no allegation that any state or local law draws a distinction between interstate and intrastate commerce so as to trigger Commerce Clause concerns. Instead, the plaintiffs contend only that UST is burdened by regulatory oversight from the state agency charged with that

oversight.  The plaintiffs then allege that individual employees of MDEQ should be held individually liable for monetary damages. Further, although the plaintiffs complain about the shipments to Missouri being halted, they admitted in writing in an agreed order that the shipments amounted to an explicit "violation of the Second Amendment to Agreed Order Number 4614-03 previously issued on June 13, 2013."  Third Amendment, pp. 1-2.  The plaintiffs' allegations neither invoke the Dormant Commerce Clause nor overcome the qualified immunity hurdle.

III. Due Process Claims

The plaintiffs' next federal cause of action is brought pursuant to the Due Process Clause.  The right to due process has both procedural and substantive dimensions.  "[T]he Due Process Clause's primary protection against the arbitrary exercise of power by government officials is its requirement of fair procedures - that is, of procedural due process."  Nicholas v. Pennsylvania State Univ., 227 F.3d 133, 139 (3rd Cir. 2000).  "The substantive component of the Due Process Clause limits what government may do regardless of the fairness of procedures that it employs, and covers government conduct in both legislative and executive capacities." Boyanowski v. Capital Area Intermediate Unit, 215 F.3d 396, 399 (3rd Cir. 2000)(citing County of Sacramento v. Lewis, 523 U.S. 833, 846 (1998)).  But the Supreme Court "has always been reluctant to expand the concept of substantive due process because guideposts for

17

responsible decisionmaking in this unchartered area are scarce and open-ended." Collins v. City of Harker Heights, 503 U.S. 115, 125 (1992).

The plaintiffs' due process claim centers on a violation of a purported liberty interest. According to the Amended Complaint, the "Defendants violated Plaintiffs' fundamental liberty interest in operations." Amended Complaint, ¶ 197. The complaint then alleges that "Defendants MDEQ, Bailey and Harrell, acting under color of state law, violated Plaintiff[s] ... fundamental liberty interest in continuing its business and allowing it to meet its obligations to other entities." Id., ¶ 198. Because the plaintiffs do not specify whether they are asserting a substantive or procedural due process claim, the Court addresses both.

A. Substantive Due Process

The starting point for both a substantive and a procedural due process claim is the showing of an identifiable liberty interest protected under the Fourteenth Amendment. See Siegert v. Gilley, 500 U.S. 226, 232 (1991)(noting that whether the plaintiff has been deprived of a right secured by the Constitution is a threshold inquiry in a § 1983 claim); Moore v. Willis Independent School Dist., 233 F.3d 871, 875 (5th Cir. 2000); Bishop v. Wood, 426 U.S. 341, 347-50 (1976)(affirming summary judgment for defendants because plaintiff had failed to show a deprivation of a cognizable liberty or property interest). As the undersigned found in Torjusen v.

18

State of Mississippi, 1995 WL 865479, (S.D. Miss. March 15, 1995),
"In order for Plaintiff to succeed on his due process claim under
§ 1983, he must prove that he has a recognized 'liberty or property'
interest within the purview of the Fourteenth Amendment." Id. at
*11.   The plaintiffs claim that "Defendants MDEQ, Bailey and
Harrell, acting under color of state law, violated Plaintiff UST's
and Williams' fundamental liberty interest in continuing its
business and allowing it to meet its obligations to other entities."
Amended Compliant, ¶ 198.  The Due Process Clause does encompass the
right "to engage in any of the common occupations of life," Board
of Regents of State Colleges v. Roth, 408 U.S. 564, 572 (1972), and
this concept of liberty protects corporations as well as
individuals.  Trifax Corp. v. District of Columbia, 314 F.3d 641,
643 (D.C. Cir. 2003). Notwithstanding this general principle,
however, the plaintiffs have not been denied the opportunity to
engage in their chosen occupation/business, and they have not
plausibly pled a cognizable liberty interest as a matter of law.

     As numerous courts have reasoned, the Constitution only
protects this enumerated liberty from state actions that threaten
to deprive persons of the right to pursue their chosen occupation.
State actions that exclude a person from one particular job or state
actions that provide governmental oversight of that job are not
actionable in a due process claim. See, e.g., Conn v. Gabbert, 526
U.S. 286, 291-92 (1999)(finding that the Fourteenth Amendment's "due

19

process right to choose one's field of private employment ... is nevertheless subject to reasonable government regulation"). The protected liberty interest is therefore one to pursue a calling or occupation, _i.e._ to enter an economic field. _Id_.; _see_ _also_ _Bernard_ _v. United Twp. High Sch. Dist. No. 30_, 5 F.3d 1090, 1092-93 (7th Cir. 1993); _Latessa v. N.J. Racing Comm'n_, 113 F.3d 1313, 1317-18 (3rd Cir. 1997).

In this case, the plaintiffs do not allege an inability to obtain employment or enter an economic field. In fact, MDEQ is only requiring the plaintiffs to perform their business activities in Mississippi in the manner to which they agreed in the agreed orders, and with continued regulatory oversight by MDEQ and Region IV of the Environmental Protection Agency ("EPA"). Third Amendment, pp. 1-20. For example, in Section 9 of the Third Amendment, the plaintiffs specifically agreed that MDEQ or the commission are not limited in taking enforcement or other actions for violations not addressed or for future violations. This is insufficient to summons any rights secured by the Fourteenth Amendment. UST is not precluded from entering an economic field, nor is it prohibited from completing a specific job. Instead, UST only must "treat and dispose" the SBM in accordance with federal and state standards.

The plaintiffs' characterization of their claim as one invoking a fundamental liberty interest is similar to the approach taken in _Lochner v. New York_, 198 U.S. 45, 64 (1905), which is "now

thoroughly discredited." See Lutz v. City of York, 899 F.2d 255, 266 (3rd Cir. 1990). As a matter of law, the Fourteenth Amendment has no application to the instant regulation of UST's conduct while it is engaged in its business. See, e.g., Conn, 526 U.S. at 292 (noting that successful due process "cases all deal with a complete prohibition of the right to engage in a calling, ... not [a] ... brief interruption"). As the Supreme Court and other courts make clear, the due process clause places its focus on prohibition into an economic field. In addition, even that right is still "subject to reasonable governmental regulation." Id.

The case before this Court does not involve a prohibition of entry into an economic field; nor does the Fourteenth Amendment provide the plaintiffs with a constitutionally-conferred liberty interest in doing business without governmental oversight. In Allocco Recycling, Ltd. v. Doherty, 378 F. Supp.2d 348, (S.D. N.Y. 2005), the district court held:

> Plaintiff is not denied the ability to engage in the transfer-station business because it cannot expand its operations to process construction debris along with fill material. It is not wholly prevented from engaging in its chosen business; rather, it simply complains that the City regulations impermissibly limit the amount of business it can do. But the Due Process Clause does not protect the claimed liberty of maximizing one's business or profit merely because it guards against government prohibition of entry into that business altogether. Plaintiff therefore has no liberty interest that can sustain its due process claims.

Id. at 373-74; see also Parate v. Isibor, 868 F.2d 821, 831-32 (6th Cir. 1989), noting that due process claims are confined to

21

situations in which individuals are precluded from entering an economic field and that, in prior case law, plaintiffs "were denied an opportunity to enter" a profession. <u>Id</u>. The <u>Parate</u> court distinguished <u>Wilkerson v. Johnson</u>, 699 F.2d 325 (6th Cir. 1983), on which the plaintiff had relied:

> In [<u>Wilkerson</u>], the plaintiff applicants were denied an opportunity to enter the barbering profession by operation of state law. <u>See id</u>. at 326-27. <u>Wilkerson</u>, however, did not involve the application of rules and regulations to individuals presently engaged in their chosen profession. <u>See id</u>. at 327. [In] <u>Wilkerson</u> ... individuals [were precluded] from <u>entering a profession</u>, and thus, may be distinguished from the present appeal, which involves the regulation of an individual's conduct while <u>engaged in the profession</u>.

<u>Parate</u>, 868 F.2d at 831-32 (emphasis in original). <u>See also</u> <u>Bernard</u> <u>v. United Twp. High Sch. Dist. No. 30</u>, 5 F.3d 1090, 1092-93 (7th Cir. 1993)("But our cases show that the Constitution only protects this liberty from state actions that threaten to deprive persons of the right to pursue their chosen occupation. State actions that exclude a person from one particular job are not actionable in suits like Bernard's that are brought directly under the due process clause. It is the liberty to pursue a calling or occupation, and not the right to a specific job, that is secured by the Fourteenth Amendment.")(quotations removed); <u>see also</u> <u>Wedges/Ledges of Cal.</u> <u>Inc. v. City of Phoenix, Ariz.</u>, 24 F.3d 56, 65 (9th Cir. 1994).

The Fourteenth Amendment is not so elastic as to distend its protection to the unfettered right to operate a business free from governmental regulation — especially not when, as here, the

22

plaintiffs entered a series of agreed orders with MDEQ and failed to satisfy the conditions of those agreements.  No company enjoys an unfettered, constitutionally-conferred liberty interest in doing business without governmental oversight.  Accordingly, the plaintiffs have not plausibly pled any cognizable liberty interest as a matter of law, let alone a "clearly established" one under which the individual defendants could be said to have acted objectively unreasonable.  Because the plaintiffs have not demonstrated a clearly established liberty interest that can sustain a substantive due process claim, dismissal of this claim is proper.

The plaintiffs also fail to demonstrate a substantive due process violation on the part of the individual defendants as a matter of law.  Substantive due process claims are not favored.  Indeed, courts routinely proffer that "[s]ubstantive due process, as a theory for constitutional redress, has in the past fifty years been disfavored[.]"  Colon Medina & Sucesores, Inc. v. Custodio, 964 F.2d 32, 41-42 (1st Cir. 1992); accord, Licari v. Ferruzzi, 22 F.3d 344, 350 (1st Cir. 1994).  In the case sub judice, even were the Court to assume, arguendo, that the plaintiffs could assert a cognizable liberty interest, the substantive due process action still fails.  Because of § 1983's personal involvement requirement and the qualified immunity standard, generalized allegations against MDEQ and/or other MDEQ employees/officials do not suffice.  See, e.g., Reyes, 168 F.3d at 161 ("'[P]laintiff [must] support[] his

claim with sufficient precision and factual specificity to raise a genuine issue as to the illegality of defendant's conduct at the time of the alleged acts.'")(quoting <u>Schultea v. Wood</u>, 47 F.3d 1427, 1434). "Heightened pleading requires allegations of fact focusing specifically on the conduct of the individual who caused the plaintiff's injury."   <u>Id</u>. (citing <u>Wicks v. Mississippi State Employment Servs.</u>, 41 F.3d 991, 995 (5th Cir. 1995); <u>see also Douthit</u>, 641 F.2d at 346 ("The plaintiff must establish either that the defendant supervisory official was personally involved in the acts causing the deprivation of his constitutional rights or that a causal connection exists between an act of the official and the alleged constitutional violation." (citing <u>Watson v. Interstate Fire & Casualty Co.</u>, 611 F.2d 120 (5th Cir. 1980); <u>Henzel v. Gerstein</u>, 608 F.2d 654 (5th Cir. 1979)).

The allegations that reasonably could be construed as against defendants Harrell and Bailey are as follows:

* Defendant Bailey had a duty to alert authorities and the Plaintiffs when he inspected the Yazoo site from 2000-2002 and witnessed the improper designs and mismanagement of the SBM.
Amended Complaint, ¶ 46.

* Defendant Bailey's failure to disclose the reality of the Hydromex operations caused significant and additional clean-up costs for Plaintiffs.
<u>Id</u>., ¶ 47.

* Plaintiff Williams spoke with Defendant Bailey from MDEQ to request if he could move the remaining SBM down the street to store it until the MDOT funding was received or other arrangements could be made, thus permitting him to comply with the Ramsay settlement

agreement.
Id., ¶ 58.

* Defendant Bailey told Plaintiff Williams he would check
to see if the remaining SBM could be moved to a facility
which was less than a mile down the road from the Yazoo
site.
Id., ¶ 59.

* Defendant Harrell directed Defendant Bailey to inform
Plaintiff Williams that he could not store the SBM a mile
down the road and that he needed to get it removed from
the Yazoo site by December 31, 2013.
Id., ¶ 60.

* Plaintiff Williams abided by Defendant Harrell's
instructions to have the material removed from the Yazoo
site by December of 2013.
Id., ¶ 65.

* Plaintiff UST entered into a contract with a recycling
facility know as and referred to as MGM in Missouri to
recycle the remaining material at the Yazoo site.
Id., ¶ 66.

* Plaintiff Williams sent a letter to Defendant Bailey on
November 18, 2013 of [sic] the shipments of SBM to
Missouri and his intention to have all of the material
removed by December 31, 2013.
Id., ¶ 69.

* Plaintiff Williams had a conversation with Defendant
Bailey and with Attorney Roy Furrh from MDEQ about the
shipments to Missouri and they expressed no concern.
Id., ¶ 70.

* Defendant Harrell began solely making the decisions
regarding UST.
Id., ¶ 74.

* Defendant Harrell testified at a hearing in Case No.
5:08CV218 that he solely made the decision, after
learning that the MDOT project failed to get its funding,
to classify the SBM as hazardous waste.
Id., ¶ 75.

* Defendant Harrell arbitrarily decided to ignore all
prior agreed orders and abused his power toward

25

Plaintiffs.
Id., ¶ 76.

\* Defendant Harrell's arbitrary and deceitful orders to
cease operation violated Plaintiffs' rights as citizens.
Id., ¶ 77.

\* Defendant Bailey spoke to Missouri EPA and informed
them that the SBM was hazardous waste, conduct for which
there was no public benefit.
Id., ¶ 78.

\* Defendants made these false statements recklessly and
with knowledge of its [sic] contrary position to prior
agreements and the consequences of said statements.
Id., ¶ 81.

\* Defendants sent a cease and desist letter to further
restrict Plaintiff's administrative rights to object to
MDEQ's order to stop removing the SBM.
Id., ¶ 93.

\* The cease and desist of operations violated Plaintiffs'
due process rights.
Id., ¶ 94.

\* Dr. Meiggs[] opined that the MDEQ lab had used their
own manufactured HCl, which created an improper testing
of the material causing unreliable results.
Id., ¶ 97.

\* Plaintiff UST's laboratory was correct in their testing
methods which demonstrated that the treated SBM was non-
toxic.
Id., ¶ 98.

\* The MDEQ test results are not valid because their
procedures were improperly performed.
Id., ¶ 99.

\* Plaintiffs assert that these improperly performed
procedures were done intentionally to serve as a means to
abuse their [sic] power over Plaintiffs.
Id., ¶ 100.

\* Defendant Herrell testified that he had never inquired
from the MDEQ lab [about] the problems with the testing
even though he was the laboratory's direct supervisor.

Id., ¶ 101.

* The treated SBM poses no threat to the environment and
Defendant Harrell's reckless indifference to Plaintiffs
serves no purpose other than an abuse of power.
Id., ¶ 102.

These allegations primarily break into two categories:

(I) Defendants Bailey and Harrell's insistence that the SBM be
removed from the Yazoo site by December 31, 2013;

(II) Defendant Harrell's alleged decision to classify the SBM
as hazardous waste.

(I). Removing SBM by December 31, 2013

Removal of the SBM and remediation of the Hydromex site by
December 31, 2013, was an explicit condition of the second agreed
order.  Specifically, the second agreed order amendment was entered
to provide "additional time to [UST] to remediate the [Hydromex]
site."  Second Amendment, p. 2.  Per the second agreed amendment,
UST was provided until December 31, 2013, to "remediate the site."
Id., pp. 2-3.  Further, the second agreed order mandated that "[a]ny
deviation from this Second Amendment to Agreed Order must be
approved in advance in writing by MDEQ on behalf of the Commission."
Id., p. 9.

In order to properly state a substantive due process claim, a
plaintiff must establish a "cognizable level of executive abuse of
power ... which shocks the conscience, violates the decencies of
civilized conduct or interferes with rights implicit in the concept
of ordered liberty."  Brown v. NationsBank Corp., 188 F.3d 579, 591

27

(5th Cir.1999)(internal quotation marks omitted).  Thus, there are no circumstances under which defendants Bailey and Harrell's instructions for UST to comply with the terms of the second amendment to the agreed order could be considered a violation of substantive due process, let alone a violation of "clearly established" substantive due process law.  See id.; Worley Brown, LLC v. Miss. Dep't of Archives & History, 2012 WL 1424398, *15-16 (S.D. Miss. Apr. 24, 2012).

(II). Classification of SBM as Waste

Much of the plaintiffs' complaint against defendant Harrell is centered on the classification of SBM as "hazardous waste" and the instruction for UST to cease transporting SBM across state lines.  These allegations do not reach the level of a constitutional concern.  The plaintiffs allege that the SBM was incorrectly classified as waste for the first time in or about 2013.  Amended Complaint, ¶ 55.  The documents attach to the complaint, however, show otherwise.  For instance, the original agreed order entered in 2003 explicitly categorized SBM as "hazardous waste."  In 2014, the plaintiffs entered a third amendment to the agreed order, in which the SBM was again classified as waste.  The plaintiffs' allegation that the SBM was incorrectly classified as waste for the first time in or about 2013 lacks any support in the record.

The Court notes that, in ruling on a motion to dismiss, it may rely on the complaint and on the documents attached to the

complaint.  <u>Financial Acquisition Partners LP v. Blackwell</u>, 440 F.3d 278, 286 (5th Cir. 2006).  In the event of a conflict between the attachment and the complaint, the attached document will control.  <u>U.S. ex rel Riley v. St. Luke's Episcopal Hospital</u>, 355 F. 3d 370, 377 (5th Cir. 2004)(citing <u>Simmons v. Peavy-Welsh Lumber Co.</u>, 113 F.2d 812, 813 (5th Cir.), <u>cert. denied</u>, 311 U.S. 685 (1940)); <u>Nishimatsu Constr. Co., Ltd. v. Houston Nat'l Bank</u>, 515 F. 2d 1200, 1206 (5th Cir. 1975); <u>Massey v. Merrill Lynch & Co., Inc.</u>, 464 F.3d 642, 645 (7th Cir. 2006)(when documents attached to complaint contradict allegations, attachments trump allegations).

The Court further finds that even if the documents did not control, the classification of SBM as waste does not reach constitutional dimensions.  The issue of whose results (the plaintiffs' or MDEQ's) were the "right" results as to the SBM's level of toxicity cannot create a constitutional issue.  To hold otherwise would be a radical departure from established federal law, and would transform garden-variety disputes between an agency charged with environmental oversight and a private business into a constitutional issue whenever there is a dispute over environmental testing results.  <u>See</u>, <u>e.g.</u>, <u>Coniston Corp. v. Village of Hoffman Estates</u>, 844 F.2d 461, 467 (7th Cir. 1988)(noting that "[n]o one thinks substantive due process should be interpreted so broadly as to protect landowners against erroneous zoning decisions," and finding that the case presented "a garden-variety zoning dispute

29

dressed up in the trappings of constitutional law"); Torjusen, 1995 WL 865479 at *12 (in which the undersigned noted that Section 1983, even in the context of the outright denial of a license or permit, "does not guarantee a person the right to bring a federal suit for denial of due process in every proceeding in which he was denied a license or permit.  If that were the case, every allegedly arbitrary denial by a town or city of a local license or permit would become a federal case, swelling our already overburdened federal court system beyond capacity").

Courts have consistently found that the Due Process Clause does not authorize federal courts to sit as appellate courts to review the correctness of a state agency's decision.  For example, the Fifth Circuit, in FM Properties Operating Co. v. City of Austin, 93 F.3d 167, 174 (5th Cir. 1996), explained that wrongly interpreting or administering state law does not create a federal constitutional claim under substantive due process.  A legally or factually incorrect decision is insufficient for a substantive due process claim.  Id. ("the due process clause does not require a state to implement its own law correctly, nor does the Constitution insist that a local government be right."); Washington v. Glucksberg, 521 U.S. 702, 720 (1997)(recognizing Court should "exercise the utmost care whenever we are asked to break new ground in [substantive due process] lest the liberty protected by the Due Process Clause be subtly transformed into the policy preferences of the Members of

30

this Court")(internal citation and quotation marks omitted); Williamson v. Lee Optical of Oklahoma Inc., 348 U.S. 483, 488 (1955)("The day is gone when this Court uses the Due Process Clause of the Fourteenth Amendment to strike down state laws, regulatory of business and industrial conditions, because they may be unwise, improvident, or out of harmony with a particular school of thought.")  Because courts are generally reluctant to recognize new substantive due-process rights, they are particularly reluctant to do so when the rights derive from a constitutional tort.  See, e.g., DeShaney v. Winnebago County Dept. of Social Servs., 489 U.S. 189, 202 (1989)("The Due Process Clause of the Fourteenth Amendment does not transform every tort committed by a state actor into a constitutional violation."); Daniels v. Williams, 474 U.S.. 327, 332 (1986)("Our Constitution deals with the large concerns of the governors and the governed, but it does not purport to supplant traditional tort law in laying down rules of conduct to regulate liability for injuries that attend living together in society.").

It is axiomatic that the United States Constitution does not require that a local government interpret its own law correctly, because "[t]he power to decide, to be wrong as well as right on contestable issues, is both privilege and curse of democracy." National Paint & Coatings Ass'n v. City of Chicago, 45 F.3d 1124, 1127 (7th Cir.), cert. denied, 515 U.S. 1143 (1995).  See also Vineyard Investments, L.L.C. v. City Of Madison, Miss., 440 F.App'x

31

310, 313 (5th Cir. 2011); <u>Marco Outdoor Advertising v. Regional Transit Authority</u>, 489 F.3d 669, 672 n.3 (5th Cir. 2007)("plaintiff must demonstrate that the abuse of power by the state official 'shocks the conscience'")(citing <u>McClendon v. City of Columbia</u>, 305 F.3d 314, 326 (5th Cir. 2002)(quoting <u>County of Sacramento</u>, 523 U.S. at 846)). <u>See</u> <u>also</u> <u>Woodard v. Andrus</u>, 649 F.Supp.2d 496, 504 (W.D. La. 2009). These long-standing principles are consistent with the routine rejection of attempts to expand the reach of the substantive due process doctrine. For instance, the Fifth Circuit has cautioned that "'only the most egregious official conduct can be said to be arbitrary in the constitutional sense.'" <u>McClendon</u>, 305 F.3d at 326 (quoting <u>County of Sacramento</u>, 523 U.S. at 846). Simply arbitrary conduct is insufficient; the conduct must be sufficiently arbitrary as to "shock the conscience." <u>Marco</u>, 489 F.3d at 673 n.3.

To properly state a substantive due process claim, the "cognizable level of executive abuse of power is that which 'shocks the conscience,' violates the 'decencies of civilized conduct' or interferes with rights 'implicit in the concept of ordered liberty.'" <u>Brown v. NationsBank Corp.</u>, 188 F.3d 579, 591 (5th Cir. 1999)(quoting <u>Rochin v. California</u>, 342 U.S. 165 (1952)). This standard is a demanding one: only "the most egregious official conduct" qualifies, <u>County of Sacramento</u>, 523 U.S. at 846, and this is particularly so when the plaintiff seeks merely to transform a purported common-law tort into a constitutional claim. In

elaborating on "the constitutional concept of conscience shocking," the Supreme Court has "made it clear that the due process guarantee does not entail a body of constitutional law imposing liability whenever someone cloaked with state authority causes harm." County of Sacramento, 523 U.S. at 848.

It is important to recognize that arbitrary and capricious "in the constitutional sense" of substantive due process is utterly unrelated to the "arbitrary and capricious" review standard employed by a state court reviewing the correctness of an agency's decision. Discussing what is "arbitrary, or conscience shocking, in a constitutional sense," the Supreme Court has espoused:

> To this end, for half a century now we have spoken of the cognizable level of executive abuse of power as that which shocks the conscience. We first put the test this way in Rochin v. California, [342 U.S. 165, 172-73 (1952)], where we found the forced pumping of a suspect's stomach enough to offend due process as conduct "that shocks the conscience" and violates the "decencies of civilized conduct." In the intervening years we have repeatedly adhered to Rochin's benchmark. See, e.g., Breithaupt v. Abram, 352 U.S. 432, 435, 77 S.Ct. 408, 410, 1 L.Ed.2d 448 (1957)(reiterating that conduct that "'shocked the conscience' and was so 'brutal' and 'offensive' that it did not comport with traditional ideas of fair play and decency" would violate substantive due process); Whitley v. Albers, 475 U.S. 312, 327, 106 S.Ct. 1078, 1088, 89 L.Ed.2d 251 (1986)(same); United States v. Salerno, 481 U.S. 739, 746, 107 S.Ct. 2095, 2101, 95 L.Ed.2d 697 (1987)("So-called 'substantive due process' prevents the government from engaging in conduct that 'shocks the conscience,' ... or interferes with rights 'implicit in the concept of ordered liberty'") (quoting Rochin v. California, supra, at 172, 72 S.Ct., at 209-210, and Palko v. Connecticut, 302 U.S. 319, 325-326, 58 S.Ct. 149, 151-152, 82 L.Ed. 288 (1937)). Most recently, in Collins v. [City of] Harker Heights, [Texas], [503 U.S. 115 at 128, 12 S.Ct. 1061 at 1070, 117

> L.Ed.2d 261 (1992)] we said again that the substantive
> component of the Due Process Clause is violated by
> executive action only when it "can properly be
> characterized as arbitrary, or conscience shocking, in a
> constitutional sense."

<u>County of Sacramento</u>, 523 U.S. at 846-47.[2]

Nothing in the plaintiffs' Amended Complaint concerning the classification of SBM rises to the level of "shocking the conscience." This is especially true since the plaintiffs have failed to remediate the Yazoo site for over eleven years, and since the SBM was labeled as waste in two agreed orders, one in 2003 and another in 2011. The characterization of SBM as waste (even hazardous waste) was clearly not too "conscience shocking" to the plaintiffs, even in a non-constitutional sense, when they twice agreed in writing to orders classifying the SBM as waste.

Moreover, even if the SBM ultimately turns out to be non-toxic, this is not conscience-shocking in a constitutional sense as a

---

[2] The Sixth Circuit has explained that the "arbitrary and capricious" criteria in the context of a substantive due process claim regarding a state administrative action "is extremely narrow." <u>Pearson v. City of Grand Blanc</u>, 961 F.2d 1211, 1221 (6th Cir. 1992). "The use of the term 'arbitrary and capricious' in this context causes considerable confusion, because these same terms are also used to describe the scope of review by state courts of state administrative action. Therefore, it must be emphasized that the state court scope of review of a decision of a state administrative agency is far broader than the federal scope of review under substantive due process." <u>Id</u>. "In some states, a state court may set aside state administrative action as being 'arbitrary and capricious' on the ground, among others, that it is not supported by substantial evidence. No such ground may be used by the federal court in reviewing state administrative action in connection with a federal substantive due process attack, however." <u>Id</u>.

matter of law.   There is a considerable "difference between state action that deprives an individual of constitutional rights and state action that is merely tortious or negligent."   Brown v. Pennsylvania Dep't of Health Emergency Med. Servs. Training Inst., 318 F.3d 473, 480 (3rd Cir. 2003)(citing County of Sacramento, 523 U.S. at 848 ("It should not be surprising that the constitutional concept of conscience shocking duplicates no traditional category of common-law fault, but rather points clearly away from liability or clearly toward it, only at the ends of the tort law's spectrum of culpability.")).   The case law makes it clear that the allegations in the case sub judice are insufficiently egregious to state a substantive due process claim.   See, e.g., Worley Brown, 2012 WL 1424398 at *15-16 (denying due process claim when the agency's decision was "contrary to the evidence" and "incorrectly decided").   In this case, there is no plausibly-pled violation of substantive due process, nor are there any allegations that can pierce the cloak of qualified immunity.   The plaintiffs may not simply allege that the Fourteenth Amendment has been violated or that an action was arbitrary.   Instead, the plaintiffs "must claim that the defendants committed a constitutional violation under current law" and "that the defendants' actions were objectively unreasonable in light of the law that was clearly established at the time of the actions complained of." Atteberry, 430 F.3d at 252-53. As the Fifth Circuit recently held,

there must be adequate authority at a sufficiently high level of specificity to put a reasonable official on notice that his conduct is definitively unlawful. <u>See</u> [<u>Morgan</u>, 659 F.3d] at 372. Abstract or general statements of legal principle untethered to analogous or near-analogous facts are not sufficient to establish a right "clearly" in a given context; rather, the inquiry must focus on whether a right is clearly established as to the specific facts of the case. <u>See</u> <u>Brosseau v. Haugen</u>, 543 U.S. 194, 198, 125 S.Ct. 596, 160 L.Ed.2d 583 (2004).

<u>Vincent v. City of Sulphur</u>, 805 F.3d 543, 547 (5th Cir. 2015); <u>see also</u> <u>Bosarge v. Mississippi Bureau of Narcotics</u>, 796 F.3d 435, 442 (5th Cir. 2015); <u>Reese v. Gray</u>, 2011 WL 302873, *5 (N.D. Miss. 2011)("'Under [the <u>Harlow</u>][3] standard, a defense of qualified immunity may not be rebutted by evidence that the defendant's conduct was malicious or otherwise improperly motivated.'")(quoting <u>Crawford-El v. Britton</u>, 523 U.S. 574, 588 (1998)).[4]  Here, the plaintiffs have not (and cannot) point to any clearly established federal law under which individual defendants Harrell and/or Bailey acted objectively unreasonable.  The plaintiffs' claim thus fails at this stage.

<u>B. Procedural Due Process</u>

As the name implies, procedural due process is primarily

---

[3] <u>Harlow v. Fitzgerald</u>, 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396.

[4] The Court notes that none of the MDEQ orders were entered into or signed by either of the individual defendants, as required for a § 1983 action against them.  In addition, many of the allegations in the Amended Complaint are directed at individuals who are not named defendants in this case.  <u>See</u>, <u>e.g.</u>, Amended Complaint, ¶¶ 82, 106-107.

concerned with procedures rather than outcomes.  Nevertheless, the purpose of guaranteeing fair procedures is "not only to ensure abstract fair play to the individual." <u>Fuentes v. Shevin</u>, 407 U.S. 67, 80-81, 92 S.Ct. 1983, 32 L.Ed.2d 556 (1972).  The procedures are deployed in protection of particular interests – "life, liberty, [and] property" – and they serve "to minimize substantively unfair or mistaken deprivations" of those interests.  <u>Id</u>. at 81.  Thus, while the procedural aspect of the Due Process Clause does not categorically bar wrongful deprivations of life, liberty, and property, it seeks to minimize the frequency of such deprivations by mandating that all government deprivations be attended by fair procedures.  <u>See</u>, <u>e.g.</u>, <u>Woodard v. Andrus</u>, 649 F.Supp.2d 496, 504-05 (W.D. La. 2009); <u>Rathjen v. Litchfield</u>, 878 F.2d 836, 839-40 (5th Cir. 1989)("[N]o denial of procedural due process occurs where a person has failed to utilize the state procedures available to him."); <u>Galloway v. Louisiana</u>, 817 F.2d 1154, 1158 (5th Cir. 1987) ("An employee cannot ignore the process duly extended to him and later complain that he was not accorded due process."); <u>Worley Brown</u>, 2012 WL 1424398 at *14.

Even if a protected liberty interest were at stake in this case, the plaintiffs cannot establish a procedural due process violation, because they have either received or chosen to forgo all the process they purportedly are due.  First of all, the complained-of orders are all <u>agreed</u> orders between MDEQ and UST.  <u>See</u> <u>Carey v.</u>

37

Piphus, 435 U.S. 247, 259, 98 S.Ct. 1042, 55 L.Ed.2d 252 (1978)
("Procedural due process rules are meant to protect persons not from
the deprivation, but from the mistaken or unjustified deprivation
of life, liberty, or property."). Second, if the plaintiffs desired
to challenge a MDEQ letter or any MDEQ position, Mississippi state
law affords them a mechanism to do so. Specifically, the relevant
state statute provides as follows:

> Any interested person shall have the right to request the
> commission to call a hearing for the purpose of taking
> action in respect to any matter within the jurisdiction
> of the commission by making a request therefor in
> writing. Upon receipt of any such request, the
> commission shall conduct such investigations as it deems
> necessary and may call a special hearing or may schedule
> such matter for its next regular meeting or hearing day,
> and after such hearings and with all convenient speed and
> in any event within thirty (30) days after the conclusion
> of such hearing shall take such action on the subject
> matter thereof as it may deem appropriate.

Mississippi Code §§ 49-17-35; 49-17-41 (Resource Conservation and
Recovery Act); see also Myrick v. City of Dallas, 810 F.2d 1382,
1388 (5th Cir. 1987)(party may not skip available state post-
deprivation procedures and then complain that the process was
inadequate or missing).

It is undisputed that UST could have requested a Commission
hearing, pursuant to the Resource Conservation and Recovery Act,
concerning the sampling differences and the disagreement over any
interpretation or position taken by MDEQ. In the third agreed
order, the plaintiffs first acknowledged "that [UST] is entitled to
an evidentiary hearing before the Commission pursuant to Mississippi

38

Code Annotated § 49-17-31." Third Amendment, ¶ 10. Following this explicit acknowledgment in writing, UST "made an informed waiver of [the] right" to an evidentiary hearing pursuant to § 49-17-35. Id.

Concerning procedural due process, "the deprivation by state action of a constitutionally protected interest in 'life, liberty or property' is not in itself unconstitutional; what is unconstitutional is the deprivation of such an interest without due process of law." Montgomery v. Mississippi, 498 F.Supp.2d 892, 910 (S.D. Miss. 2007)(citing Parratt v. Taylor, 451 U.S. 527, 537 (1981) (emphasis in original)). Here, all orders were agreed to, state law provided the plaintiffs with a mechanism for challenging any MDEQ action or position, plaintiff UST admitted that it was entitled to a hearing, and the plaintiffs made an "informed" waiver of the right to a hearing in writing. In addition, none of the MDEQ orders were entered into by either of the individual defendants, as required for a § 1983 action, and there is no clearly established procedural due process law under which the individual defendants could have acted objectively unreasonable. Thus, the plaintiffs have failed to state a claim for infringement of procedural due process.

In conclusion, the Court has found a variety of reasons why the federal claims the plaintiffs have brought against defendants Harrell and Bailey in their individual capacities fail. As a matter of law, none of the facts alleged by the plaintiffs trigger any concerns protected by the Dormant Commerce Clause, or identify a

liberty interest secured by the Fourteenth Amendment, let alone demonstrate that defendants Harrell and/or Bailey acted objectively unreasonable under any "clearly established" federal law.  These reasons entitle the individual defendants to dismissal, for no federal law provides an avenue for relief.  Defendants Harrell and Bailey's motions to dismiss shall therefore be granted.

PRELIMINARY INJUNCTION

As for the plaintiffs' motion for preliminary injunction against MDEQ, it is barred by the Eleventh Amendment.  The Eleventh Amendment bars all of the plaintiffs' causes of action asserted against MDEQ, including the request for a preliminary injunction. In addition, MDEQ is not a "person" for purposes of 42 U.S.C. § 1983, the statute through which the plaintiffs' federal claims are urged, and the Court previously granted MDEQ's motion to dismiss based on sovereign immunity (docket entry 60).  The states, arms of states, and officials acting in their official capacities are not "persons" within the meaning of § 1983.  Will v. Michigan Department of State Police, 491 U.S. 58, 71 (1989); Davis v. City of Vicksburg, Miss., 2015 WL 4251008, *2 (S.D. Miss. 2015)(finding that "states and their arms are not 'persons' who can be liable under § 1983.").

In addition, to the extent that the request for preliminary injunctive relief might be premised upon state law, it is plainly barred by Pennhurst State Sch. & Hosp. v. Haldernen, 465 U.S. 89, 104 S.Ct. 900 ("Pennhurst II").

40

The Court previously entered a Memorandum Opinion and Order (docket entry 60) denying the plaintiffs injunctive relief against MDEQ and Harrell and Bailey in their official capacities, and dismissing state law claims for injunctive relief without prejudice. The court now denies the plaintiffs injunctive relief against Harrell and Bailey in their individual capacities as well.

Accordingly,

IT IS HEREBY ORDERED that the Motion to Dismiss **(docket entry 34)** brought by defendant Richard Harrell in his individual capacity is GRANTED;

FURTHER ORDERED that the Motion to Dismiss **(docket entry 36)** brought by defendant Steven Bailey in his individual capacity is GRANTED;

FURTHER ORDERED that the Motion for Preliminary Injunction **(docket entry 53)** brought by plaintiffs U.S. Technology Corporation and Raymond F. Williams is DENIED.

A Final Judgment incorporating this Memorandum Opinion and Order, and the Court's prior Memorandum Opinion and Order (docket entry 60) shall follow.

SO ORDERED, this the 28th day of July, 2016.

/s/ David Bramlette
UNITED STATES DISTRICT JUDGE